IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

JACQUELYNE D. SANFORD,                :
                                      :
            Plaintiff,                :
                                      :
v.                                    :        CASE No.: 1:13-CV-174 (LJA)
                                      :
WALMART, INC.                         :
                                      :
            Defendant.                :
_____  :

## ORDER

Before the Court are Defendant Walmart, Inc.'s[1] Motion for Summary Judgment, Defendant's Motion to Strike Plaintiff's Surreply Filed Without Court Approval, and Plaintiff Jacquelyne D. Sanford's Motion for Extension of Time to File Response Defendant's Motion to Strike and Motion for Leave to File a Surreply.  (Docs. 17, 28, 29, 30). For the reasons articulated below, Defendant's Motion for Summary Judgment, (Doc. 17), is **GRANTED**, Defendant's Motion to Strike, (Doc. 28), is **GRANTED**, and Plaintiff's Motion for Extension and Motion for Leave to File a Surreply, (Docs. 29, 30), are **DENIED**.

## PROCEDURAL BACKGROUND

On August 21, 2009, Plaintiff, then an Assistant Manager at Wal-Mart Store 899 in Valdosta, Georgia, filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination based on race, color, sex, and religion, as well as retaliation ("2009 EEOC Charge").  (*See* Docs. 19-2 at 18, Doc. 19-1 at 36:3-7, 41:2-10).  After Defendant was notified of Plaintiff's EEOC charge, Defendant negotiated an informal resolution, through the EEOC ("2009 Religious Accommodation"), in which it was

[1] Defendant represents that the proper defendant in this matter is Wal-Mart Stores East, L.P., the operating entity of the store at which Plaintiff works.  (Doc. 17, n. 1).

agreed that Plaintiff's religious beliefs and responsibilities would be accommodated by not assigning her to work on Sundays or on Wednesday evenings after 5:00pm.  (*See* Docs. 19-1 at 42:1-17; 19-2 at 17).  On July 11, 2011, the EEOC issued a Notice of Right to Sue, which terminated its processing of the 2009 charge.  (*See* Docs. 19-1 at 44:2-13; 19-2 at 21).

On March 27, 2013, Plaintiff, then an Assistant Manager at Wal-Mart Store 1006 in Cordele, Georgia, filed a second charge of discrimination with the EEOC ("2013 EEOC Charge").  (Doc. 19-2 at 84).  Plaintiff alleged the denial of religious accommodation, race, sex and age discrimination, and retaliation for filing her 2009 EEOC Charge.  (*Id.*)  On August 19, 2013, the EEOC issued its Dismissal and Notice of Rights, finding that "[b]ased upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes."  (Doc. 19-2 at 94).

On November 5, 2013, Plaintiff initiated this action by filing a Complaint, claiming harassment, discrimination based on race, sex, age, and religion, as well as retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII").  (Doc. 1).  On April 18, 2014, Defendant filed an Answer to Plaintiff's Complaint.  (Doc. 8).  On March 16, 2015, Defendant filed a Motion for Summary Judgment on all of Plaintiff's claims.  (Doc. 17).  On April 8, 2015, Plaintiff responded.  (Doc. 23).  On April 16, 2015, Defendant filed a Reply.  (Doc. 24).  Accordingly, Defendant's Motion for Summary Judgment, (Doc. 17), is now ripe for review.  *See* M.D. Ga. L.R. 7.3.1(a).

## FACTUAL BACKGROUND[2]

### I.    Relevant Period and Time-Barred Allegations

Plaintiff's Complaint contains numerous allegations that are time-barred.  A charge under Title VII must be filed with the EEOC "within one hundred eighty days after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1); *see also Lexecon*

---

[2] The relevant facts are derived from Plaintiff's Complaint, (Doc. 1), Defendant's Answer to Plaintiff's Complaint, (Doc. 8), Defendant's Motion for Summary Judgment and Statement of Undisputed Material Facts, (Doc. 17); Defendant's Memorandum of Law in Support of Motion for Summary Judgment, (Doc. 18), Plaintiff's Response to Defendant's Motion for Summary Judgment, (Doc. 23), and Defendant's Reply Memorandum in Support of Motion for Summary Judgment, (Doc. 24).  Where relevant, this factual summary also contains undisputed facts derived from the pleadings, the discovery and disclosure materials on file, and any affidavits, all of which are construed in the light most favorable to the non-moving party. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

*Inc. v. Milberg Weiss Bershad Hynes & Leach*, 523 U.S. 26, 35 (1998).  Therefore, any "acts of alleged discrimination that occurred prior to 180–days before the filing of [an] EEOC charge are 'untimely filed and no longer actionable.'"  *Summers v. City of Dothan, Ala.*, 757 F. Supp.2d 1184, 1201 (M.D. Ala. 2010) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)).  Plaintiff filed her unsworn intake questionnaire with the EEOC on November 28, 2012.  (*See* Doc. 23 ¶ 26).  However, "an intake questionnaire does not constitute a valid charge under Title VII for purposes of the statute of limitations." *Pijnenburg v. West Georgia Health System, Inc.*, 255 F.3d 1304, 1306 (11th Cir. 2001).  Plaintiff's EEOC charge is dated March 27, 2013.  (Doc. 23 ¶¶ 2, 26).  Accordingly, any allegedly unlawful acts that occurred prior to September 28, 2012 are time barred.

As discussed below, Plaintiff was subject to several job performance actions in 2011, including verbal coachings on June 3, 2011 and July 2, 2011, a written coaching on July 26, 2011, a decision-day coaching on or about December 22, 2011, was placed on a Performance Improvement Plan in January, 2012, and received her 2012 job performance evaluation on April 2, 2012.  (Docs. 17 at 16-23; 23 at 17-23).  While these acts occurred prior to September 28, 2012 and will not be considered as a basis for Plaintiff's Title VII claims, the Court will exercise its discretion to consider Plaintiff's untimely allegations as providing background or context for Plaintiff's claims.  "[T]ime-barred evidence of discriminatory treatment may be used . . . to illuminate current practices which, viewed in isolation, may not indicate discriminatory motives."  *E.E.O.C. v. Atlanta Gastroenterology Associates, LLC*, No. 1:05-CV-2504-TWT, 2007 WL 602212, at *14 (N.D. Ga. Feb. 16, 2007) (internal quotation marks omitted) (citing to *Allen v. Montgomery Cnty. Ala.*, 788 F.2d 1485, 1488 (11th Cir. 1986)).  *See also United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977) (noting that a discriminatory act "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue. . . .").

## II.     Plaintiff's Employment History with Wal-Mart

Plaintiff, Jacquelyne Sanford is a fifty-one (51) year old African American woman, who has been employed by Defendant on two occasions.  (*See* Doc. 1; s*ee generally* Doc. 17). In 1998 or 1999, Plaintiff began as a part-time cashier at Wal-Mart Store 1072 in Tifton, Georgia, and later was promoted to the full-time position of head Customer Service Manager ("CSM").  (Doc. 19-1 at 24-26).  In 2000 or 2001, Plaintiff resigned "because of a disagreement with [her] boss [the Store Manager]."  (*Id.* at 26:6-21).  Plaintiff returned to Wal-Mart Store 1072 in Tifton on June 29, 2006 as a part-time cashier, and later was promoted to the full-time position of overnight CSM.  (*See id.* at 28-31).

On October 15, 2007, Plaintiff entered Wal-Mart's Management Training Program. (*See id.* at 32:5-7; Doc. 19-2 at 5).  This program lasted eight to ten weeks, and involved training at both Wal-Mart Store 1072 in Tifton and Wal-Mart Store 899 in Valdosta, Georgia.  (Doc. 19-1 at 32:2-33:19).  Upon completion of the program, Plaintiff was promoted to an Assistant Manager position at the Valdosta store.  (*See id.* at 33:15-19; Doc. 19-2 at 2).  This promotion resulted in a pay increase for Plaintiff from $8.05 to $18.27 per hour and corresponding salary of approximately $38,000.  (*See* Docs. 19-1 at 35:1-4, 36:18-23; 19-2 at 2).  Plaintiff has been an Assistant Manager for Wal-Mart from December 2007 until the present day.  (*See* Doc. 19-1 at 36:3-7; 48:4-12).  During this time, Plaintiff has received several increases in salary, such that her current salary is approximately $43,000 per year.  (*See* Docs. 19-1 at 37:5-17; 19-2 at 2).  During Plaintiff's entire employment at Wal-Mart, she has never received any decrease in pay, been demoted, or terminated.  (*See* Docs. 19-1 at 37:18-38:15; 19-2 at 2).  Plaintiff alleges that her pay decreased in 2011 but provides no evidence to controvert Defendant's documentation of her compensation history.  (*See* Docs. 23 ¶ 6; 19-2 at 2).

## III.     Plaintiff's Religious Activities

Plaintiff is a resident of Tifton, Georgia, and is the pastor of Jesus Vessels Outreach Ministry, a nondenominational church in Tifton.  (Doc. 19-1 at 6: 10-13, 14:11-24, 15:20-22).

The church was founded in 2000.  (*Id.* at 15:7-10).  The congregation meets regularly on Sundays and Wednesdays.  (*Id.* at 16:12-19).  On Sundays, Sunday school begins at 10:00 a.m. and the worship service begins at 12:00 p.m.  (*Id.* at 16:12-14).  On Wednesdays, bible study begins at 6:00 p.m.  (*Id.* at 16:17).  On December 22, 2012, Plaintiff's church held a Christmas Dinner.  (*See id.* at 112:20-114:8; Doc. 19-2 at 92).

## IV.    Policies and Practices related to Employee Performance and Discipline at Wal-Mart's Cordele Store

Throughout Plaintiff's employment at the Cordele store, Defendant maintained several policies related to employee job performance and discipline.  Defendant's Coaching for Improvement Policy, Performance Improvement Plan, Annual Performance Evaluations, Discrimination and Harassment Prevention Policy, and Open-Door Policy are germane to this action.  (*See* Docs. 19-2 at 23:30, 78:5-8; 19-1 at 62:5-19).

The first step under the Coaching Improvement Policy requires that an employee receive a verbal coaching—a notice of deficient job performance and recommendations on improving performance.  (*See* Doc. 19-1 at 25-58:58:7).  The second step is a written coaching, and the third step—usually the final step before termination—is called a decision-making day coaching.  (*Id.* at 58:8-17).  For this final step, the employee is required to take a day off with pay to develop a written plan of action addressing how they will correct the conduct or issues that had led to the coaching.[3]  (*Id.* at 58:18-21).

Under the Performance Improvement Plan ("PIP") a supervisor creates a written plan that identifies their concerns with an employee's performance or behavior, details the areas in which the employee must improve, and recommends specific means to realize the improvement.  (*See* Doc. 19-2 at 39-40).  The supervisor then meets with the employee four times at regular intervals—initially, to discuss and implement the plan, then for three successive follow-up sessions.  (*See id.*)

---

[3] In April 2012, the terminology under the Coaching for Improvement policy changed. The initial verbal coaching was changed to first written coaching; the written coaching was changed to second written coaching; and the decision-making day coaching was changed to third written coaching.  (Doc. 19-1 at 58:22-59:15).

Generally, in April of each year, store managers administer written job performance evaluations to their assistant managers.  (*See id.* at 77:2-82:25; Doc. 19-2 at 52-70).  The evaluation form reflects job performance ratings in 12 areas[4] and an overall rating, with "Goals Summary" weighted at 30%, "Competencies" weighted at 60%, and "Diversity and Inclusion" weighted at 10%.  (*E.g.* Doc. 19-2 at 55). The evaluation form also includes the store manager's comments and space for the assistant manager's self-assessment. (*E.g.* Doc. 19-2 at 52-56).

 Defendant's Discrimination and Harassment Prevention Policy prohibits all forms of illegal discrimination, harassment and retaliation, and provides a complaint procedure for associates if the need to file a complaint arises.  (*See id.* 19-2 at 27-30; Doc. 21-1 ¶ 5).  If an employee reports conduct they believe violates the Discrimination and Harassment Policy, Defendant initiates what is called a Red Book Investigation.  (Doc. 19-1 at 85:10-22).

Under Defendant's Open-Door Policy, an employee may appeal coachings, evaluations, and virtually any issue affecting the terms and conditions of their employment. (*See id.* at 62:5-24).  The appeal may start with the store manager, and can then be taken to the next level, the market manager or market human resources manager, and ultimately, if desired, to the President or Chairman of the Board of the company.  (*Id.*)

Plaintiff was familiar with each of these policies, and as an Assistant Manager, had access to them through Defendant's online system referred to as the WIRE.  (*See id.* at 57:7-9, 58:8-59:20, 60:1-7, 62:5-24; Doc. 21-1 ¶ 6).

## V.   Facts regarding Events Occurring Outside the Relevant Time Period

### A.  Plaintiff's First EEOC Charge

Although Plaintiff checked the boxes alleging race, color, sex, and religious discrimination and retaliation on her 2009 EEOC Charge, the onus of her complaint centered around an alleged failure to accommodate her religious beliefs and responsibilities

---

[4] The 12 areas addressed on the annual performance forms are 1) Goals Summary; 2) Summary; 3) Competencies; 4) Thought Leadership: Judgment: Use Appropriate Judgment; 5) Results Leadership: Customer/Member Centered: Focus on the Customer/Member; 6) Results Leadership: Planning and Improvement: Plan and Pursue Team-Based Improvement; 7) People Leadership: Talent: Supervise Associates; 8) Company Initiative: Associate Engagement; 9) Functional: Drives Store Experience; 10) Functional: Manages Merchandising Operations; 11) Diversity and Inclusion; and 12) Diversity: Diversity.  (*See, e.g.* Doc. 19-2 at 5256).

as a pastor in her church.  (*See* Docs. 19-1 at 41:2-10; 19-2 at 18).  Plaintiff alleged that, prior to filing her EEOC charge, she complained to Defendant's regional human resource manager and market managers about the failure of the management at the Valdosta store to accommodate her religious activities on Sunday and Wednesday evenings.  (*See* Doc. 19-1 at 115:19-116).  Pursuant to the resulting 2009 Religious Accommodation, Plaintiff was not scheduled to work on Sundays or Wednesday evenings at the Valdosta Store.  (*Id.* at 42:18-21).

### B.  Plaintiff's Transfer to Defendant's Cordele Store

In September 2009, Plaintiff transferred from the Valdosta store to Wal-Mart Store 1072 in Tifton as an Assistant Manager.  (*See id.* at 44:25-45:11, 46:1-6; Doc. 19-2 at 2).  Following Plaintiff's transfer to the Tifton store, it was discovered that Plaintiff's sister-in-law was already an employee there.  (Doc. 19-1 at 46:22-47:14).  Because of Defendant's anti-nepotism policy, Plaintiff then transferred to Wal-Mart Store 1006 in Cordele, Georgia on January 16, 2010 as an Assistant Manager.  (*Id.*; Doc. 19-2 at 2).

The management hierarchy at Wal-Mart's Cordele store is composed of Zone Merchandise Supervisors ("ZMS"), Assistant Mangers, Co-Managers, and a Store Manager.  Each ZMS reports to an Assistant Manager.  (*See* Doc. 19-1 at 86:7-17).  Two overnight Assistant Managers and five daytime Assistant Managers report to two Co-Managers.  (*See id.* at 50:8-52:6).  The Co-Managers report to one Store Manager.  (*Id.*)  Maranda Anderson was a ZMS at the Cordele Store who reported to Plaintiff in 2012.  Anderson is female but the record does not indicate her race.  (*See id.* at 86:10-23).  During Plaintiff's employment as an Assistant Manager at the Cordele store, Plaintiff has reported directly to several Co-Managers, including Kim Alexander, John Hicks, and Charon Prophet.  (*See id.* at 50:21-51:11).  Alexander is an African American female.  (*id.* at 65: 14-22).  Hicks is a Caucasian male.  (*Id.* at 65:17-22).  Prophet is an African American male.  (*Id.* at 98:3-7).  Mike Harris[5] has served as the Store Manager of the Cordele store since Plaintiff's transfer.  (*Id.* at 49:23-50:7).  Harris is a white male.  (Doc. 1 at 3).

---

[5] Mike Harris is also referred to as "Donnie Harris" (*See* Docs. 1; 19-1 at 49:23-50:4).

### C.  Plaintiff's Job Performance and Disciplinary Issues in 2011

Store Manager Mike Harris asserts that he was unaware of the 2009 Religious Accommodation when Plaintiff transferred to the Cordele store on January 16, 2010 but "after [he] was made aware of the accommodation, [] made certain that the Cordele store continued to honor the informal agreement. . . ."  (Doc. 21-1 ¶ 2, 3).  The record does not indicate when Harris became aware of the 2009 Religious Accommodation.  The Parties agree that Plaintiff has never worked on either a Sunday or Wednesday evening since transferring to the Cordele store.  (*See* Docs. 19-1 at 53:7-23; 21-1 ¶ 3).  Plaintiff alleges, however, that Defendant attempted unsuccessfully to schedule her to work on a prohibited period on at least three occasions and that she was "bullied daily" by Store Manager Harris and Co-Manager Hicks.  (*See* Doc. 23 ¶¶ 12, 13).

Plaintiff testified that she was initially scheduled to work one Wednesday evening but refused, which prompted a rearrangement of the scheduling to accommodate Plaintiff.  (Doc. 19-1 at 53:7-54:8).  The record does not indicate the date on which this incident occurred.  Plaintiff also alleges that, in April 2011, May 2011, and January 2014, "management" at the Cordele store attempted to schedule her to work during a period that conflicted with the 2009 Religious Accommodation.  (Doc. 23 ¶¶ 12, 13).  Plaintiff complained about this.  (*Id.*)  According to Plaintiff, "[m]anagement took offense [when] Plaintiff[] [initially] remind[ed] them of the agreement" and "the coaching process" started shortly thereafter in June 2011.  (*Id.*)  Plaintiff does not point to evidence of any of the incidents alleged, the member of Defendant's "management" to whom she refers, or the basis for her belief that they took offense to her reminding them of the 2009 Religious Accommodation.

Plaintiff also alleges that, beginning late in 2011, she was "bullied daily" by Store Manager Harris and Co-Manager Hicks who forced her into situations that resulted in her receiving multiple coachings and a PIP.  (Doc. 19-1 at 108:12-111:9).  Plaintiff testified that:

> [Harris and Hicks were] continuously on to me about something. Or to me felt like they were trying to get me written up. They would assign me tasks when my

[subordinate Zone Merchandise Supervisor] wasn't there or when my department manager wasn't there to try to put a burden on me to get it done. So I would have to do it. I would have to do those tasks myself when they knew that I didn't have enough -- didn't have my [Zone Merchandise Supervisor] or I didn't have my department manager there. So it was like they would do it when I didn't have the help or they would, you know, just act in ways that kept me from completing my tasks or completing my job, getting my job done.

(*Id.* at 108-109:5).

On June 3, 2011, Plaintiff received a verbal coaching from Co-manager John Hicks. (*See* Doc. 19-2 at 32). According to Hicks, Plaintiff failed to verify a deposit before it was sent to the bank. (*Id.*; Doc. 19-1 at 61:5-25). Hicks noted that Plaintiff's performance on that occasion caused the store to incur "a charge back of [$]10,000.00" and "teaches her associates that it is ok not to follow company procedures." (Doc. 19-2 at 32). Although Plaintiff did not dispute that she had not verified the deposit, she appealed the coaching through Defendant's Open-Door Policy. (Doc. 19-1 at 62:1-7). The coaching was upheld. (*See id.* at 63:3-7).

On July 26, 2011, Plaintiff received a written coaching from Co-Manager Kimberly Alexander. (*See* Doc. 19-2 at 34-35). According to Alexander, Plaintiff failed to complete several assigned tasks, including inactivating TV's, removing DVD's from carts, removing TV's from pallets, and scanning toys in bins. (*Id.*) Alexander noted that Plaintiff's performance on that occasion "makes the store not run company programs [and] makes her fellow [associate store managers] workload heavier because they have to complete her task." (*Id.*) Plaintiff disagreed with the coaching and she appealed it through the Open-Door process to the market manager. (*See id.*; Doc. 19-1 at 64:5-65:3). The coaching was upheld. (*See* Doc. 19-1 at 65:4-11). Plaintiff alleges that "[t]he PIP was reversed and dropped."[6] (Doc. 23 ¶ 23).

On December 23, 2011, Plaintiff received a decision-making day coaching by Co-Manager John Hicks for exercising poor business judgment. (Doc. 19-2 at 37). According to Hicks, Plaintiff was responsible for ensuring that copies of a certain video game were properly returned to the vendor, but in reviewing the task, it was determined that there were

---

[6] This allegation is not supported by any evidence in the record.

a number of missed returns.  (*See id.* at 37; Doc. 19-1 at 66:3-15).  Hicks noted that Plaintiff's performance on that occasion caused the store to incur a markdown of over $10,000.  (*See* Docs. 19-2 at 37; 19-1 at 66:16-21).  Plaintiff acknowledged that she had not properly completed the task but appealed it through the Open-Door Policy.  (*See* Docs. 19-2 at 37; 19-1 at 66:22-67:7).  The coaching was upheld.  (Doc. 19-1 at 67:8-10).

Between December 2011, and January 2012, Co-Manager John Hicks placed Plaintiff on a PIP.  (*See id.* at 67:22-69:21).  On January 7, 2012, Plaintiff met with Hicks to review and implement the plan.  (*See id.* at 69:22-25).  The PIP indicated, "[Plaintiff] struggles with getting her daily routines completed. In order to help, management took away half of her responsibilities in order for her to get control over her performance. [Plaintiff] has failed to complete her national priorities/shrink matrix consistently." (Doc. 19-2 at 39).  In order to correct improve her performance, the PIP indicated, "[Plaintiff] will meet with ACP/Co-Mgr weekly for follow up on Priorities/Matrix and the deadlines for completion" and "[Plaintiff] will be required to follow her attached training plan and use this knowledge to improve her performance." (*Id.*)  The report from the First Follow-Up Session, dated February 7, 2012, rated Plaintiff's progress as "Below Expectations." (*Id.* at 46).  While it indicated that "[Plaintiff] has made improvements in her knowledge base" it also states:

> "[Plaintiff] has not grasped the concept of applying the knowledge she has learned. After her training on claims and recalls she missed another major recall in electronics. After receiving training on her cell phone log, she did not follow up to ensure it was complete[,] causing her to miss national priorities. During inventory there were several notes that she did not get completed.

(*Id.* at 16).  The report from the Second Follow-Up Session, dated March 11, 2012, again rated Plaintiff's progress as "Below Expectations." (*Id.* at 49).  While it indicates that Plaintiff has a good understanding of her routines, the importance of planning and the use of key electronic tools, it notes that she "has not made any improvements in her performance." (*Id.*)  Specifically, it states:

> "[Plaintiff] is still struggling with the same issues that she has before. She has failed to set up a plan and follow up on her shrink matrix and phone log, causing store to miss national priorities two weeks in a row. She has failed to plan for her modular sets in electronics and toys. She has not been completing her tour notes and her departments have low operating standards.

(*Id.*)

Plaintiff was scheduled to have her Third Follow-Up Session under the PIP with Hicks in May 2012. (Doc. 19-1 at 83:1-8). The third session never took place, however, because shortly before it was to occur, Plaintiff filed an Open Door appeal challenging the PIP and her 2012 performance evaluation. (*See id.* at 83:8-84:7). As a result, the PIP was never completed. (*Id.* at 84:21-85:1). Plaintiff was never coached or disciplined in any way as a result of the PIP. (*Id.* at 84:11-85:5; Doc. 21-1 ¶ 14).

### D. Plaintiff's Annual Performance Evaluations

Plaintiff received annual performance evaluations for each fiscal that she has worked at the Cordele store. (*See* Doc. 19-2 at 52-70). For 2011, Store Manager Mike Harris drafted Plaintiff's evaluation. (*See id.* at 58-60, Doc. 19-1 at 87:21-23). Harris gave Plaintiff an overall rating of "Solid Performer" but noted that Plaintiff needed to: "utilize all the necessary tools to help her plan for sales[,]" and "follow up on routines and performance in a timely manner and be more directly involved in her areas." (Doc. 19-2 at 60). Plaintiff disagreed with the evaluation, noting on the form that, "there has not been any attempt to develop me by training or teaching. . . . I feel my management team does not have my best interest at heart and desire to see me fail." (*Id.*)

Plaintiff's 2012 evaluation was also done by Harris. (*Id.* at 52-56). Harris gave Plaintiff an overall rating of "Development Needed," and specifically rated her as a "Solid Performer" in the "Goals Summary" and "Diversity and Inclusion" categories, but as "Development Needed" in the heavily-weighted "Competencies" category. (*Id.* at 55). Harris specifically noted that Plaintiff needs to "develop routines to follow up on expectations and assist associates in their development[,]" "use good judgment in making decisions[,]" "[a]lways follow company procedures[,]" "complete planning in advance for projects[,]" and "task associates daily in myguide." (*Id.* at 55). Plaintiff disagreed with the evaluation, directing her comments on the form to her rating in one category, "People Leadership: Talent: Supervise Associates" and stated, "I've come to the conclusion that retaliation is taking place and I don't feel it's fair for someone to rate my performance with

that kind of mind set." (*Id.* at 56).  Plaintiff did not state the basis for her belief that she was the subject of retaliation.  Plaintiff also appealed this evaluation through Defendant's Open-Door Policy.  (Doc. 19-1 at 78:19-23).  The record does not indicate any decision on this appeal.

## VI.   Facts regarding Events Occurring Within the Relevant Time Period

### A.  Complaint Against Plaintiff

In August 2012, Maranda Anderson filed a complaint against Plaintiff under Defendant's Discrimination and Harassment Policy.  (*See* Doc. 19-1 at 85:10-90:18).  Anderson was employed as a ZMS and reported directly to Plaintiff.  (*See id.* at 86:7-17).  Anderson alleged that Plaintiff was "trying to push [her] religion on her and others."  (*Id.* at 86:18-23). Anderson also complained that Plaintiff was leaving religious pamphlets in the associate break room.  (*Id.* at 87:4-12).  This complaint triggered an internal investigation under Defendant's Red Book protocol. (*Id.* at 87:13-15).  Plaintiff provided two written statements in the course of the investigation.  (*See id.* at 87:13-90:17; Doc. 19-2 at 78).  In a written statement dated October 19, 2012, Plaintiff acknowledged sending emails to other employees, stating "you shall reap what you sow" but denied that her intent was negative as she also stated "[t]hanks, have a blessed day" or "[b]e blessed."  (Doc. 19-2 at 75-78). Plaintiff also denied describing the "store/[co]-manager [as] my enemy" but insisted that "they see me as the enemy . . . [a]nd I do feel they are my enemies because they do everything they can to see me fail, and not succeed."  (*Id.* at 76).  At the conclusion of the investigation, no formal coaching or other disciplinary action was taken against Plaintiff. (Doc. 19-1 at 89:20-90:1).  Instead, Co-Manager Hicks met with Plaintiff and instructed her to not leave any more pamphlets in the break room and informally counseled her on showing respect for her co-workers.  (*Id.* at 89:12-90:18; Doc. 21-1 ¶ 15).

As a follow-up to the Red Book investigation, Keisha Crossland, Defendant's Market Human Resources Manager offered Plaintiff the opportunity to transfer from the Cordele store to Wal-Mart Store 686 in Fitzgerald, Georgia.  (Doc. 19-1 at 90:19-91:7).  This would have been a lateral move to another Assistant Manager position.  (*Id.* at 91:10-16).  Plaintiff

declined the offer and remained in her position at the Cordele store.  (*Id.* at 91:20-22).  In explaining her decision, Plaintiff stated,

> I felt that the issue with my Sundays and Wednesdays would not go away whether I moved or not. Because I felt that that was the issue with Mike Harris is that, you know, I had my Sundays and my Wednesdays and he had to, you know, basically accommodate that. So I didn't feel that that would be beneficial to me to move to another store.

(*Id.* at 91: 22-92:4).

### B.  Plaintiff's Request for Time Off on Thanksgiving and Christmas of 2012

The Parties agree that the period from Thanksgiving through to the Christmas holiday is generally the busiest period of the year at the Cordele store.  (*See id.* at 114:17-21).  On Thanksgiving Day, assistant managers would typically be scheduled to work either in the morning, allowing them to spend time with family in the afternoon, or in the afternoon, thereby allowing them time with family in the morning.  (*Id.* at 117:1-7).  In 2012, however, Plaintiff was one of three assistant managers who were scheduled to work split shifts—both morning and afternoon shifts separated by a break of a few hours.  (*Id.* at 117:1-118:22).  Plaintiff appealed the scheduling,[7] and was allowed to only work one shift on Thanksgiving Day.  (*Id.* at 118:23-119:12).

Plaintiff alleges that, on November 1, 2012, she gave Store Manager Harris and Co-Manager Hicks a copy of her church's event calendar for the year.  (*Id.* at 112:8-13).  The Christmas Dinner at Plaintiff's church was scheduled for Saturday, December 22, 2012.  (*See id.* at 112:20-113:9; 19-2 at 92).  According to Plaintiff, she was not scheduled to work on that day but still requested time off to attend the Christmas Dinner.  (*See id.* at 112:8-113:19).  Plaintiff contends that Harris and Hicks rearranged the schedule to require that she work that Saturday.  (*Id.* at 114:2-5).  Plaintiff worked on December 19, 20, and 21 but "called out" on the 22nd, the day of the Christmas Dinner.  (*See* Docs. 19-2 at 92; 19-1 at 113:23-114:8).  Plaintiff states, "I felt like the company or Mike [Harris] or John [Hicks] violated that 2009 [Religious Accommodation]."  (Doc. 19-1 at 115:16-18).  Plaintiff

---

[7] It is unclear with whom Plaintiff filed her appeal. At her deposition, she testified that she likely lodged it with the regional human resource manager, but in correspondence with the EEOC regarding her 2012 charge, she indicated that she appealed directly to Defendant's CEO and President.  (*Compare* Docs. 19-1 at 119:4-12 and 19-2 at 92).

does not allege that Harris, Hicks or any other supervisor cited to her absence on Thanksgiving Day or December 22 in 2012 in any job performance or disciplinary action to which she was subjected during the relevant period.

### C.  Plaintiff's Second EEOC Charge

On March 27, 2013, Plaintiff filed her 2013 EEOC Charge, alleging the denial of religious accommodation, race, sex and age discrimination, and retaliation for filing her 2009 charge of discrimination.  (Doc. 19-2 at 84).  In a letter dated July 23, 2013, Jose Quinones, an EEOC investigator, outlined his preliminary findings of fact and invited Plaintiff to correct any information she deemed incorrect.  (*See id.* at 86-88).  In a written statement dated August 5, 2013, Plaintiff responded to Mr. Quinones.  (*Id.* at 90-92; Doc. 19-1 at 99:15-18).  With regard to the internal complaint filed against her in August, 2012, Plaintiff stated,

> At the time I was using a common saying that happened to be in my emails. "Be not deceived; God is not mocked; for whatsoever a man soweth, that shall he also reap." What is the difference if I would have said "what goes around comes around?" One is a manmade term and the other a God given one. I felt like the higher managers in the store did not want me to succeed as did my ZSM, according to the email she sent to Co-manager John Hicks on April 11, 2012.

(Doc. 19-2 at 91).  Finally, with regard to the disputes arising from her requests to take time off for church-related activities during Thanksgiving and Christmas in 2012, Plaintiff stated:

> In November 2012, I worked 5 not 3 days the week of Thanksgiving. John Hicks scheduled me to work a double shift on Thanksgiving Day. I emailed the CEO and President of the Company to my concern of not having time to spend with my family. This is the reason I was granted my request for the days off. Not because I insisted. During Christmas weekend I asked to be off so that I could cook for my church's annual Christmas Banquet. The respondent stated that the schedule was rearranged so that I could attend my church function. I worked December 19-21, 2012. The function was on Saturday 22, 2012 6:00 p.m. I was scheduled from 12pm to 10:00pm that day. I had no time to cook.  I called out on the 22nd, the day of the banquet. It was my understanding according the agreement in the [2009 Religious Accommodation], and under Title 7 of the Civil Act of 1964, that my religious activities were agreed upon. I would be allowed to carry out my religious beliefs and activities without interference as long as I gave my employer a 30 day advance notice of any religious activity I would be a part of that would require me to be absent from work.

(*Id.* at 92).  The record before the Court does not indicate that the 2009 Religious Accommodation included accommodations for Thanksgiving or Christmas holidays.  On August 19, 2013, the EEOC issued its Dismissal and Notice of Rights, finding that "[b]ased upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes."

### D. Plaintiff's Additional Job Performance Issues

Plaintiff has received two annual evaluations since the "Development Needed" evaluation she received in April 2012.  (*See id.* 19-2 at 62-70).  Plaintiff's 2013 and 2014 evaluations were done by Store Manager Mike Harris.  (*Id.* at 62-70).  On both forms Harris gave Plaintiff an overall rating of "Solid Performer" and noted "Follow up and follow through[,]" "Results leadership–Planning and improvement[,]" and "Merchandise Operations" as areas requiring improved performance.  (*See e.g. id.* at 70).  Plaintiff disagreed with the 2013 evaluation.  (Doc. 19-1 at 81:19-82:2).  On the 2013 form, Plaintiff noted, however, that she "[n]eed[s] to ensure Play books are executed according to company policy and modular are implemented by [zone management supervisor] in a timely manner, preferably 3 weeks in advance."  (Doc. 19-2 at 65).

On June 11, 2014, Plaintiff received a written coaching from Co-manager Charon Prophet.  (*See id.* at 94:20-95:11).  According to Prophet, Plaintiff was not properly staffing the front end of the store with cashiers and customer service managers, the cash office was failing to complete its daily operations, and Plaintiff was not following instructions with respect to evaluations on associates under her supervision.  (*Id.*)  Prophet noted that Plaintiff's performance resulted in "customer complaints on the front end, customer service, and money center[,]" the store "receiving another no for the month concerning the AP assessment[,]" and could result in "shortages and compliance issues."  (*Id.*)  Plaintiff disagreed with the coaching and submitted two Open-Door appeals.  (Doc. 19-1 at 95:12-23).  Final disposition of Plaintiff's appeal was still pending at the time of her deposition.  (*Id.* at 14-97:23).

## SURREPLY AND MOTION TO STRIKE

Without permission of the Court, Plaintiff filed a Surreply on April 27, 2015, and a supplement to her Surreply on April 29, 2016. (Docs. 26, 27). On May 7, 2016, Defendant filed a Motion to Strike Plaintiff's Surreply and supplement. (Doc. 28). On May 20, 2015, Plaintiff moved for an extension to file a response to Defendant's Motion to Strike. (Doc. 29). On May 29, 2015, Plaintiff filed a motion for leave to file a surreply. (Doc. 30). Generally, "[s]urreply briefs are not favored." M.D. Ga. L.R. 7.3.1. While the Court, in its discretion, may allow a party to file a surreply, "this discretion should be exercised in favor of allowing a surreply only where a valid reason for such additional briefing exists, such as where the movant raises new arguments in its reply brief." *Federick v. Mercedes-Benz USA, LLC,* 366 F. Supp.2d 1190, 1197 (N.D. Ga. 2005). "To allow such surreplies as a regular practice would put the court in the position of refereeing an endless volley of briefs." *Garrison v. Northeast Georgia Medical Center, Inc.*, 66 F. Supp.2d 1336, 1340 (N.D. Ga. 1990). Upon review of Plaintiff's proposed surreply and supplement, the Court finds that Plaintiff proffers no explanation for permitting her untimely motions. Instead, Plaintiff alleges new facts that occur outside of the relevant period of her Title VII claim. Therefore, Defendant's Motion to Strike Plaintiff's Surreply and supplement, (Doc. 28), is **GRANTED** and Plaintiff's motion for an extension to file a response to Defendant's Motion to Strike, (Doc. 29) and motion for leave to file a surreply, (Docs. 29, 30), are **DENIED**.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 allows a party to move for summary judgment when the party contends no genuine issue of material fact remains and the party is entitled to judgment as a matter of law. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Maddox v. Stephens*, 727 F.3d 1109, 1118 (11th Cir. 2013). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Grimes v.*

*Miami Dade Cty.*, 552 F. App'x 902, 904 (11th Cir. 2014) (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000)).  "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  An issue of fact "is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Barreto v. Davie Marketplace, LLC*, 331 F. App'x 672, 673 (11th Cir. 2009).  The movant can meet this burden by presenting evidence showing there is no genuine dispute of material fact, or by demonstrating to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *See Celotex*, 477 U.S. at 322-24.  Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial."  *Id.* at 324.  To avoid summary judgment, the nonmoving party "must do more than summarily deny the allegations or show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (citations and internal quotations omitted).  Instead, the nonmovant must point to evidence in the record that would be admissible at trial.  *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (noting that hearsay may be considered on a motion for summary judgment only if it "could be reduced to admissible evidence at trial or reduced to admissible form") (quotation omitted).  Such evidence may include affidavits or declarations that are based on personal knowledge of the affiant or declarant.  *See* Fed. R. Civ. P. 56(c)(4).

On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict in its favor.  *See Celotex*, 477 U.S. at 322-23; *Allen*, 121 F.3d at 646.  However, the Court must grant summary

judgment if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

Local Rule 56 requires the movant to attach to its motion for summary judgment a separate and concise statement of material facts to which the movant contends there is no genuine issue to be tried.  M.D. Ga. L.R. 56.  The non-movant must then respond "to each of the movant's numbered material facts."  *Id.*  "All material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate."  *Id.*

In Plaintiff's Response to Defendant's Motion for Summary Judgment and Statement of Undisputed Material Facts, Plaintiff attempts to controvert several facts asserted by Defendant without any citation to the record.  (*See generally* Doc. 23).  Thus, Plaintiff has failed to comply with Local Rule 56 and those material facts in Defendant's Motion for Summary Judgment and Statement of Undisputed Material Facts, (Doc. 17), which are not controverted with citations to the record are "deemed to have been admitted, unless otherwise inappropriate.  M.D. Ga. L.R. 56.  The Court, however, "cannot grant a motion for summary judgment based on default or as a sanction for failure to properly respond."  *United States v. Delbridge*, No. 1:06-CV-110-WLS, 2008 WL 1869867, at *3 (M.D. Ga. Feb. 22, 2008) (citing *Trustees of Cent. Pension Fund of Int'l Union of Operating Engineers & Participating Employers v. Wolf Crane Serv., Inc.*, 374 F.3d 1035, 1040 (11th Cir. 2004)).  Instead, the Court must undertake an independent review of "the evidentiary materials submitted in support of the motion" to ensure that the defendant has met its burden of demonstrating the absence of a genuine issue of material fact.  *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004); *see also Delbridge*, 2008 WL 1869867, at *3 (finding that the "Court must make an independent review of the record," even if the non-movant fails to respond to the statement of material facts.).

**DISCUSSION**

Plaintiff, proceeding *pro se,* brings claims against Defendant for unlawful harassment, discrimination based on race, gender, age, and religion, and retaliation, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against an individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). Additionally, Title VII prohibits an employer from retaliating against an employee "because [s]he has opposed any practice made an unlawful employment practice . . . or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

## I.    Disparate Treatment Claims based on Race, Gender, Age

"A plaintiff may establish a claim of illegal disparate treatment through either direct evidence or circumstantial evidence." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1085 (11th Cir. 2004) (citation omitted). "Disparate treatment claims require proof of discriminatory intent either through direct or circumstantial evidence." *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000). Where, as here, the record contains no direct evidence in support of Plaintiff's claim, courts evaluate the circumstantial evidence supporting such Title VII claims under the burden-shifting framework developed in *McDonnell Douglas Corp. v. Green.* 411 U.S. 792, 802-04 (1973). *McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008). Under this burden-shifting framework, a plaintiff must first establish a prima facie case of unlawful discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802. If a plaintiff establishes her prima facie case, a defendant must provide a legitimate, nondiscriminatory reason for its actions. *Id.* at 802-03. If the defendant satisfies this burden, the plaintiff must then prove that the defendant's reasons are a pretext for unlawful discrimination. *Id.* at 804. Throughout this process, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at

all times with the plaintiff." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

To establish a prima facie case for disparate treatment based on race, gender, or age under Title VII, a plaintiff must produce evidence sufficient to prove that: "(1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside her protected class more favorably; and (4) she was qualified to do the job." *Joe's Stone Crab, Inc.*, 220 F.3d at 1286. Plaintiff, however, has failed to show that she was subjected to an adverse employment action.

An adverse employment action requires a "*serious and material* change in the terms, conditions, or privileges of employment." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis provided). In making this determination, "the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id.* Plaintiff alleges that the written coaching she received from Co-Manager Charon Prophet on or about May 25, 2014 for job performance issues constitutes an adverse employment action. While Plaintiff disagrees with the written coaching, there is no evidence proving any material change in her employment, such as a termination, demotion, or decrease in pay resulting from the coaching. *See Summerlin v. M & H Valve Co.*, 167 Fed. App'x. 93, 97 (11th Cir. 2006) (a reprimand that does not "have an impact on an important condition of employment, such as salary, title, position, or job duties," is not an adverse employment action). *See also Hawkins v. Potter*, 316 F. App'x 957, 960 (11th Cir. 2009) (finding that three letters from plaintiff's employer citing past performance problems failed to establish adverse impact upon the terms, conditions, or privileges of plaintiff's employment in a "real and demonstrable way.") (Internal citation omitted); *Clark v. Potter*, 232 F. App'x 895, 897 (11th Cir. 2007) (adverse employment action not established where letter of warning did not cause plaintiff loss of pay, loss of grade, employment benefits or any other "tangible job effects."). Accordingly, Plaintiff has failed to produce evidence sufficient to establish a prima facie case of disparate treatment on the basis of race, sex, or age.

## II.      Religious Discrimination Claim

Title VII requires an employer "make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship." *Lake v. B.F. Goodrich Co.*, 837 F.2d 449, 450 (11th Cir. 1988) (citation and quotation omitted).  To establish a prima facie case of religious discrimination based on a failure to accommodate religious beliefs, a plaintiff must produce evidence sufficient to prove: (1) she had a bona fide religious belief that conflicted with an employment requirement; (2) she informed his employer of his belief; and (3) she was disciplined for failing to comply with the conflicting employment requirement.  *Dixon v. Palm Beach Cty Parks and Recreation Dept.*, 343 F. App'x 500, 501-502 (11th Cir. 2009).  Plaintiff has failed to establish that she was disciplined for failing to comply with an employment requirement that conflicted with her religious activities.

During the relevant period, Plaintiff opposed being scheduled to work a split shift on Thanksgiving Day and being scheduled to work on December 22, 2012, the same day as her church's Christmas Dinner.  Plaintiff does not allege, however, nor does the record evidence show, that Plaintiff was subjected to an adverse employment action or otherwise disciplined because of either incident.  Not only was Plaintiff not required to work the split shift on Thanksgiving, she suffered no consequences for calling out on the 22nd.  Furthermore, Harris gave Plaintiff an overall rating of "Solid Performer" on her 2013 and 2014 job performance evaluations.  The 2014 written coaching issued by Co-Manager Prophet also was not related to the schedule or the leave taken for Thanksgiving or Christmas.  Accordingly, Plaintiff has failed to produce evidence sufficient to establish a prima facie case of disparate treatment on the basis of religion.  *See Dixon*, 343 F. App'x at 502 ("Although evidence showed that Dixon was given a written record of counseling, was initially denied his requests for Sundays off, and was transferred from the bicycle patrol unit, these were not adverse employment actions because they did not result in a serious material change in the terms, conditions, and privileges of Dixon's employment.").

Likewise, Plaintiff has failed to establish a prima facie case of discrimination based on a failure to provide a reasonable religious accommodation because she was accommodated on Thanksgiving and was not disciplined for failing to comply with an employment requirement that conflicted with his religious beliefs on December 22nd.  (*Id.*) ("Dixon [] failed to establish a prima facie case of discrimination based on a failure to provide a reasonable religious accommodation because he was not disciplined for failing to comply with an employment requirement that conflicted with his religious beliefs.").

## III.   Retaliation Claim

Even when a plaintiff fails to state a disparate treatment violation of Title VII, she may still establish a violation of the antiretaliation provision of Title VII.  *See Sullivan v. Nat'l R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999).   Under the antiretaliation provision, it is "an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing. . . ."  42 U.S.C. § 2000e-3(a).  Plaintiff alleges that Defendant retaliated against her for opposing work scheduling that threatened to violate the 2009 Religious Accommodation in May 2011, April 2011, on Thanksgiving Day and the day of her Church Dinner, and in January 2014.  (Doc. 19-1 at 116:18-117:14).  As discussed above, Defendant's allegedly unlawful conduct prior to September 28, 2012 is time-barred.  Thus, the only retaliatory acts Plaintiff alleges within the relevant period occurred on Thanksgiving Day and the day of her church's Christmas Dinner in 2012, and in January, 2014.

To establish a prima face case for retaliation under Title VII, a plaintiff must produce evidence sufficient to prove the following elements: "(1) [s]he engaged in a protected activity; (2) [s]he suffered an adverse employment action; and (3) a causal connection between the protected activity and the adverse employment action."  *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).

Plaintiff has failed to establish that she suffered an adverse employment action after

opposing being scheduled to work on Thanksgiving Day and December 22, 2012.    In *Burlington*, the Supreme Court broadened the type of employer conduct considered actionable in retaliation cases "from that which adversely affects the plaintiff's conditions of employment or employment status to that which has a materially adverse effect on the plaintiff, irrespective of whether it is employment or workplace-related." *Crawford*, 529 F.3d at 973-74 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).  A materially adverse  action can be anything that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68.  As Plaintiff was accommodated on Thanksgiving and was not disciplined for failing to comply with an employment requirement that conflicted with her religious beliefs on December 22nd, Plaintiff has failed to show that she was subjected to a materially adverse action.

Plaintiff has failed to demonstrate a causal connection between her opposition to scheduling that violated the 2009 Religious Accommodation in January, 2014,  and the written coaching issued by Co-Manager Prophet on or about May 25, 2014.   "To demonstrate a causal connection between a protected activity and an adverse employment action, the plaintiff must show that: (1) the decisionmakers knew of his protected activity; and (2) the protected activity and adverse action were not wholly unrelated." *Harris v. Florida Agency for Health Care Admin.*, 611 F. App'x 949, 951 (11th Cir. 2015).  "In most cases, a close temporal proximity between the protected conduct and the adverse action creates a genuine issue of material fact about the causal connection between the two." *Id.*; s*ee also Hulbert v. St. Mary's Health Care System*, Inc., 439 F.3d 1286, 1298 (11th Cir. 2006).  Under Eleventh Circuit precedent, however, even a three month disparity between the protected activity and the adverse employment action is too long as a matter of law to infer causation.  *See Bailey v. City of Huntsville*, 517 F. App'x 857, 861 (11th Cir. 2013) (three month gap insufficient); *Thomas v. Cooper Lightning, Inc.,* 506 F.3d 1361 1364 (11th Cir. 2007) (five month gap insufficient).  As a four month gap separates Plaintiff's religious opposition and the alleged adverse action in 2014,  Plaintiff fails to "create[] a genuine issue of material fact about the causal connection between the two." *Harris*, 611 F. App'x at 951.  *See also Bailey*, 517 F. App'x at 861; *Thomas,* 506 F.3d at 1364.   Accordingly, Plaintiff has failed to establish a prima facie case of

retaliation under Title VII.

## IV.     Hostile Work Environment Claim

A hostile work environment claim under Title VII is established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) *quoting Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).  In doing so, a plaintiff must produce evidence sufficient to prove: (1) that she belongs to a protected group; (2) that she has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.  *Miller*, 277 F.3d at 1275.

Plaintiff's hostile work environment claim turns on whether the harassment she alleges was based on a protected characteristic and whether it was sufficiently severe or pervasive to create a discriminatorily abusive working environment.  Plaintiff alleges that she was "bullied daily" by Store Manager Harris and Co-Manager Hicks who, beginning in late 2011, attempted to "get [her] written up" and subjected her to multiple coachings and the PIP.  (*See* Docs. 19-1 at 106:12-109:11, 111:10-112:7; 23 ¶¶ 20-23, 29).  Plaintiff alleges that on one occasion, an unnamed supervisor attempted to schedule her to work on a Wednesday evening, despite the 2009 Religious Accommodation but there is no evidence in the record to support this allegation.  Plaintiff also alleges that Defendant attempted to schedule her to work two shifts on Thanksgiving Day and on the day of her church's Christmas Dinner in 2012.

Plaintiff's harassment claims based on race, sex and age fail, however, because no evidence in the record establishes any relationship between these incidents and her race, sex, or age.  Plaintiff's harassment claim based on her religion also fails for similar reasons.

Plaintiff does not allege, nor does the record evidence establish, whether the alleged Wednesday evening scheduling incident occurred within the relevant period.  That the work schedule was ultimately changed to comply with the accommodation illustrates that, while an individual employee may have made a mistake, Defendant complied with the 2009 Accommodation.  Further, Plaintiff does not allege, nor does evidence in the record raise the inference, that Store Manager Harris or Co-Manager Hicks were motivated by religious animus in scheduling Plaintiff to work a split shift on Thanksgiving Day or on the day of her Church's Christmas Dinner.  Therefore, Plaintiff's harassment claim fails because she has failed to produce evidence sufficient to prove that that the alleged harassment was based on any characteristic protected under Title VII.

Even if the harassment Plaintiff alleges was based on Plaintiff's race, sex, age, or religion, the evidence does not establish that it was so severe or pervasive as to create a discriminatorily abusive work environment.  This element of Plaintiff's case contains a subjective and an objective component.  *Forklift Systems,* 510 U.S. at 21-22.  The employee must subjectively perceive the harassment as being severe, but the objective severity should be judged from the perspective of a reasonable person in the plaintiff's position.  *See Adams v. Austal U.S.A., LLC,* 754 F.3d 1240, 1249 (11th Cir. 2014).  In evaluating the objective severity of alleged harassment, courts engage in a fact-intensive inquiry by considering, among other factors: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Miller*, 277 F.3d at 1276; *see also Edwards v. Wallace Comty Coll.,* 49 F.3d 1517, 1521-22 (11th Cir. 1995).  In so doing, courts must examine the conduct in its entirety, "not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive." *Faragher v. City of Boca Raton*, 524 U.S. 775 (11th Cir. 1999).  Furthermore, claims based on a plaintiff's "subjective perception and speculation rather than specific facts" may not be used to establish an objectively hostile work environment.  *Brown v. Progress Energy*, 364 F. App'x 556, 558 (11th Cir. 2010).

Viewing the evidence in the light most favorable to Plaintiff, she points to four incidents of alleged harassment within the relevant period: the attempt to schedule her to work on one unspecified Wednesday evening, scheduling her to work a split shift on Thanksgiving Day, scheduling her to work on the same day as her church's Christmas Dinner, and a written coaching in January, 2014.  While there is no "magic number" of incidents that meet the objective severity requirement, these four incidents do not evidence offensive conduct that is "so commonplace, overt [or] denigrating that they created an atmosphere . . . charged with" racial, sexual, age-based, or religious hostility.  *Edwards*, 49 F.3d at 1521; *see also Barrow v. Georgia Pacific Corp.*, 114 F. App'x 54, 58 (11th Cir. 2005) (holding that "isolated and sporadic instances" of harassment did not create an objectively hostile work environment.).  As the conduct Plaintiff complains of was infrequent, was not physically threatening, and did not affect her job performance, it cannot be said to be sufficiently severe to alter the terms and conditions of employment to establish that Plaintiff was subjected to a hostile work environment.   Therefore, Plaintiff's hostile work environment claim fails.

## CONCLUSION

Accordingly, Defendant's Motion for Summary Judgment, (Doc. 17), is **GRANTED**, Defendant's Motion to Strike, (Doc. 28), is **GRANTED**, and Plaintiff's Motion for Extension and motion for leave to file a surreply, (Docs. 29, 30), are **DENIED**.


**SO ORDERED**, this  29th  day of September, 2016.

                    /s/ Leslie J. Abrams
**LESLIE J. ABRAMS, JUDGE**
**UNITED STATES DISTRICT COURT**